UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| JODY SIMPSON, Mother & Next Friend of J.S., a Minor, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) )  Case No. 17-cv-1340-JES-JEH |
| TRI-VALLEY COMMUNITY UNIT SCHOOL DISTRICT NO. 3; an Illinois Local Governmental Entity, DAVID MOUSER, Superintendent, in his Individual Capacity, and BEN DERGES, Principal of Tri Valley High School, in his Individual Capacity, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

## ORDER AND OPINION

This matter is now before the Court on cross motions for summary judgment. Plaintiff Jody Simpson filed a Motion (D. 33[1]) for Summary Judgment. Defendants Tri-Valley Community Unit School District No. 3[2], David Mouser, and Ben Derges filed a collective Response (D. 42) in Opposition and Plaintiff filed a Reply (D. 46). Defendants Tri-Valley Community Unit School District No. 3, David Mouser, and Ben Derges filed a Motion (D. 34) for Summary Judgment. Plaintiff filed a Response (D. 39) to Defendants' Motion for Summary Judgment, and Defendants filed a Reply (D. 45). For the reasons set forth below, Plaintiff's Motion is DENIED, and Defendants' Motion is GRANTED.

---

[1] Citations to the Docket in this case are abbreviated as "D.__"
[2] Any claims against Defendant Tri-Valley Community Unit School District No. 3 were dismissed by the Court's Order on July 9, 2018; however, this Defendant was joined as a necessary party in the Amended Complaint pursuant to 745 ILCS 10/9-102.

1

## BACKGROUND

Plaintiff filed a Complaint, since amended, in July 2018 against Defendants, seeking damages pursuant to 42 U.S.C. § 1983 for alleged violations of the Fourth Amendment rights of her child, J.S., a minor. D. 1. Specifically, Plaintiff alleged that Ben Derges ("Derges"), the principal of Tri-Valley High School, conducted an unlawful search of J.S.'s cellphone and that Derges had a custom of seizing and searching student cellphones unlawfully. Plaintiff further alleged David Mouser ("Mouser"), the school district's superintendent, had knowledge of Derges' alleged unlawful conduct and acquiesced in that custom. *Id.*

The following facts are undisputed. In April 2017, J.S., the son of Plaintiff Jody Simpson, was a 15-year-old freshman at Tri-Valley High School. D. 33, at 3-4. At all relevant times, J.S. had a Samsung Galaxy cellphone registered with the school. *Id.* at 4. On the day of the incident that is the basis for this action, Dr. Cross, a teacher at the high school, overheard a student, N.W., discussing a picture of another student, W.J., wearing a trench coat with a gun and the words "Don't come to school tomorrow" (the "Gun Meme[3]"). *Id.* at 5. Dr. Cross reported what he heard to Principal Derges between first and second period. D. 34, at 7.

After receiving the report from Dr. Cross, Derges began an investigation into the Gun Meme. *Id.* Derges first spoke to N.W. at approximately 9:00 A.M. in the library. D. 33, at 6. N.W. reported to Derges that he had not seen the Gun Meme but had heard about it from another student, D.K. *Id*. Derges next spoke to D.K. in the hall outside D.K.'s second period class. *Id*. D.K. also reported he had not seen the Gun Meme but had heard people talking about it. *Id*. at 7. Between second and third period, Derges called W.J. to his office. *Id*. W.J. denied having any

---

[3] The parties do not include a definition of "meme" in their undisputed facts; however, Merriam-Webster defines "meme" as 1) an idea, behavior, style, or usage that spreads from person to person within a culture; 2) an amusing or interesting item (such as a captioned picture or video) or genre of items that is spread widely online especially through social media. https://www.merriam-webster.com/dictionary/meme (last accessed June 30, 2020).

knowledge of the Gun Meme and consented to a search of his cellphone. *Id*. W.J. submitted he had posted a photograph of himself on Snapchat the previous night and, at Derges' request, W.J. showed Derges the photograph. *Id.* Derges described the photograph as W.J. wearing an oversized coat at play practice the night before. *Id.* This picture of W.J. matched the description of the image used to create the Gun Meme. D. 34, at 8. W.J. informed Derges that he could see who took a screenshot of his pictures on Snapchat, and W.J. showed Derges that S.D. and Y.W. had taken screenshots of his picture from play practice. *Id*. After his interview with W.J., Derges believed that two students may have saved a screenshot of W.J.'s photograph and one of the students may have edited the image. D. 33, at 7.

Derges next interviewed two students, S.D. and Y.W., together in his office. *Id*. at 8. S.D. told Derges that earlier that morning, a group of freshman boys were in the "commons" area of the high school. D. 33, at 8. The boys were viewing and laughing at the photograph W.J. had posted on Snapchat from play practice the night before. *Id.* S.D. further stated that J.S. had asked S.D. to take a screenshot of the picture and send it to him. *Id.* S.D. told Derges that he sent J.S. a screenshot of the picture of W.J. *Id.* S.D. explained to Derges that J.S. had a history of making memes that made fun of specific people, including W.J., and that J.S. made memes during school hours. D. 34, at 9. S.D. said the memes were sometimes exchanged by text message. *Id.* S.D. also reported he knew J.S. to bully W.J., including making fun of the way W.J. talks. *Id.* When Derges asked to see S.D.'s cellphone, S.D. voluntarily gave his phone to Derges. *Id.* at 10. Derges reviewed S.D.'s cellphone and did not see anything concerning in nature. *Id.*

Shortly after the lunch hour began, Derges called J.S. to his office. D. 33, at 9. Derges was concerned J.S. might talk to his friends over lunch and possibly destroy any incriminating evidence or "alter testimony." *Id.* With J.S. in his office, Derges made handwritten notes while he

searched the camera roll of J.S.'s unlocked cellphone. *Id.*[4] Derges discovered some 12-15 images of W.J. on J.S.'s cellphone; however, Derges did not find either the Gun Meme or the unedited photograph of W.J. on J.S.'s cellphone. *Id.* at 10.

Derges found other images on J.S.'s cellphone that he found concerning, including memes of W.J. D. 34, at 11. Derges took individual pictures of those memes with his own cellphone. *Id.* One such meme superimposed W.J.'s head onto an image of a Washington Post article regarding cocaine use. *Id.* J.S. also had the original, unedited image of the Washington Post article on his phone. *Id.* J.S. admitted to editing the image to include W.J.'s head, claiming he created the meme to "express his feelings about [W.J.'s] frequent sniffing in class." *Id.* Another meme was based on an image from the Onion, a satirical news site, which originally featured a man "flying" towards two sub sandwiches and includes the caption "Fly on in for Subtember[*sic*] 11!" *Id.* at 11-12. J.S. had superimposed W.J.'s face on the flying man and superimposed the face of another student over each of the sub sandwiches. *Id.* J.S. also admitted to creating that meme, which he said was intended "to express some of the stress [J.S.] was feeling at th[at] time" due to W.J.'s purported harassment of the other student. *Id.* Several of the images appeared to be screenshots from the "WTC" Instagram account, which J.S. used to post memes he created. *Id.* at 12. Derges then dismissed J.S. *Id.* at 14.

After his initial meeting with J.S., Derges met with Mr. Roop ("Roop"), the Athletic Director for the High School, who assists Derges with some discipline matters when called upon. *Id.* Derges wanted more details about a potential bullying situation and to determine whether the Gun Meme even existed. *Id.* at 14-15. Derges and Roop met with S.D. and D.K. again. *Id.*[5] In the second meeting with D.K., D.K. eventually admitted he had posted the Gun Meme as a joke. *Id.*

---

[4] The parties disagree on whether J.S. gave Derges consent to search his cellphone.
[5] The parties disagree on whether Derges and Roop met first with S.D. or D.K.

at 15. D.K. then consented to a search of his phone, but D.K. had already deleted the Gun Meme from his phone. *Id.* D.K. indicated J.S. also makes fun of W.J. at school and that they use the "WTC" Instagram account to post memes making fun of W.J. and others. *Id.* In the second meeting with S.D., S.D. said he had sent the screenshot of W.J. to J.S. *Id.* S.D. told Derges and Roop he had observed J.S. making fun of W.J. in the past in the form of "countless" memes and pictures, as well as in person. *Id.* S.D. named other students who were also involved in bullying W.J. *Id.* Derges and Roop met with the other students who S.D. had identified, and those students admitted to bullying behavior. *Id.* at 16.

Around 2:00 PM, Derges and Roop met with J.S. to discuss the memes and pictures Derges had seen on J.S.'s cellphone and that multiple students had identified J.S. as bullying W.J. *Id.* During this meeting, J.S. admitted to bullying W.J. *Id.*[6] Derges subsequently contacted J.S.'s mother, Jody Simpson, and J.S. received two days of directed study for his involvement in bullying W.J. *Id.* at 17.

The Board of Education for Tri-Valley Community Unit School District No. 3 has established a Policy Manual that, in relevant part, describes standards for search and seizure of students and their property. D. 34-11, at 29-30. The Policy Manual states, "School authorities may search a student and/or the student's personal effects … when there is a reasonable ground for suspecting that the search will produce evidence the particular student has violated or is violating either the law or the District's student conduct rules." *Id.* at 29. The search must be conducted in a manner reasonably related to its objective and not excessively intrusive. *Id.*

The Policy Manual also contains provisions prohibiting bullying, intimidation, and harassment. D. 34-11, at 34-38. Section 7:180 states "[b]ullying, intimidation, and harassment

---

[6] Plaintiff admits that J.S. "said whatever he believed Roop and Derges wanted to hear," but made this admission under duress and disputes making the admissions freely and voluntarily. D. 39, at 6.

diminish a student's ability to learn and a school's ability to educate. Preventing students from engaging in these disruptive behaviors and providing all students equal access to a safe, non-hostile learning environment are important District goals." *Id.* at 34. "The District will not tolerate harassing, intimidating conduct, or bullying whether verbal, physical, sexual, or visual, that affects the tangible benefits of education, that unreasonably interferes with a student's educational performance, or that created an intimidating, hostile, or offensive educational environment." *Id.* at 10.

The Tri-Valley High School Student Handbook, 2016-2017 (the "Handbook"), which J.S. reviewed and agreed to abide by, contains a "Bullying & Harassment" policy. D. 34, at 6; D. 34-12, at 24. It declares it is an "important school goal" to prevent students from engaging in disruptive behaviors, such as bullying, intimidation, teen dating violence and harassment. D. 34-12, at 24. Harassment, intimidation, and bullying, which are defined as repeated instances of threatening or detrimental behavior directed toward another student," are offenses subject to discipline. *Id.* at 31. Bullying behavior includes communications made in writing or electronically "directed toward a student that has or can be reasonably predicted" to place the student in fear, cause a detrimental effect on the student's physical or mental health, interfere with the student's academic performance, or interfere with the student's ability to participate in or benefit from the services, activities, or privileges provided by a school. *Id.* at 24-25. The Handbook also states that the Superintendent or Principal may require a student to provide a password or other related account information to gain access to the student's social networking account or profile if school authorities have "reasonable cause" to believe the account contains evidence that a student has violated a school rule or procedure. *Id.* at 35.

The parties now move for summary judgment pursuant to Fed. R. Civ. P. 56.

6

## LEGAL STANDARD

Summary judgment is proper where the materials in the record demonstrate there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The role of the judge in resolving a motion for summary judgment is not to weigh the evidence for its truth, but to determine whether sufficient evidence exists for a jury to return a verdict in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court will construe the record "in the light most favorable to the non-movant" in deciding whether the case involves genuine issues of fact requiring a trial. *Payne v. Pauley*, 337 F.2d 767, 770 (7th Cir. 2003). By filing cross-motions for summary judgment, each movant must show he has met the traditional standards necessary to obtain judgment as a matter of law. *United Transp. Union v. Illinois Cent. R.R.*, 998 F. Supp. 874, 880 (N.D. Ill. 1998). The Court must evaluate each motion separately on its merits, draw all reasonable inferences, and resolve all factual uncertainties against the party whose motion is under consideration. *Id.*

## DISCUSSION

Plaintiff presents several arguments to support her motion for summary judgment. First, Plaintiff claims J.S. did not give valid consent because J.S. did not believe he was free to leave Derges' office until he relented to a search of his cellphone. D. 33, at 12. Second, Plaintiff argues Derges did not have reasonable suspicion to search J.S.'s cellphone, characterizing it as a "digital strip search of J.S." *Id.* at 15. Third, Plaintiff contends Derges exceeded the scope of a reasonable search because Derges searched through the camera roll, rather than limiting his search to the Snapchat application, and because Derges had information that signaled J.S. was not responsible for the Gun Meme. *Id.* at 18. Fourth, Plaintiff argues Defendants are not entitled to qualified immunity because Derges should have known that reasonable suspicion was required to search a

7

student's cellphone and no good faith reason exists to justify the search of J.S.'s cellphone. *Id.* at 21. Finally, Plaintiff contends the District and Mouser had a custom of permitting Derges to violate students' constitutional rights by conducting non-consensual searches of students' cellphones. *Id.* at 22.

Defendants argue they are entitled to summary judgment because Derges complied with constitutional standards when he searched J.S.'s cellphone. D. 34, at 3. They contend there was reasonable suspicion that J.S. was involved with the Gun Meme and/or bullying of W.J. *Id.* The search of J.S.'s phone was reasonable in scope because it was specifically targeted to uncover evidence of violations of the school's conduct rules. *Id.* Defendants argue further that even though the search complied with constitutional standards, they are entitled to qualified immunity. *Id.* Finally, Defendants submit that J.S. provided consent to the search by voluntarily handing over his cellphone to Derges upon request and entering his passcode so the phone could be searched. *Id.*

*Whether the Search Complied with Constitutional Standards*

The Fourth Amendment prohibiting unreasonable searches and seizures applies to searches conducted by public school officials. *New Jersey v. T.L.O.*, 469 U.S. 325, 333 (1985). The United States Supreme Court has held that searches conducted by school officials are "a careful balancing of governmental and private interests" and the legality of those searches should depend on the reasonableness, under all the circumstances, of the search. *Id.* at 341. Determining whether a search by a school official was reasonable involves a two-step inquiry. *Id.* First, the court must determine whether the search was justified at its inception. *Id.* Second, the court must determine whether the search was reasonably related in scope to the circumstances which justified the search in the first place. *Id.*

8

A search is justified at its inception when there are reasonable grounds to suspect the search will turn up evidence the student has violated the law or the rules of the school. *Id.* at 341-42. As a school principal, Derges needed to have a reasonable suspicion he would find evidence on J.S.'s cellphone of the Gun Meme or evidence of J.S. bullying other students. *Id.*

When Derges became aware of the Gun Meme, he began an investigation to determine who created the image and whether it posed a credible threat to the school. As Derges interviewed students, he determined the Gun Meme was an edited photograph of W.J., that W.J. did not create the Gun Meme, and that W.J. did not present a credible threat to the school. Derges continued to interview students to determine who had created the Gun Meme. Through the course of the investigation, Derges was informed that J.S. was involved in bullying W.J. Before his meeting with J.S., Derges had talked to S.D., who said a group of boys had been laughing at the unedited picture of W.J. posted on Snapchat. S.D. said J.S. had requested S.D. send him a screenshot of the picture. S.D. also informed Derges that J.S. had a history of making memes that made fun of specific people, including W.J., and that J.S. had made memes during school hours. S.D. told Derges that J.S. would bully W.J., including making fun of the way W.J. talks.

Plaintiff argues that Derges lacked reasonable suspicion to search J.S.'s cellphone because Derges never believed there was an imminent threat to the safety of the school prior to his search of J.S.'s cellphone, as evidenced by Derges failure to notify law enforcement or lock down the school. D. 33, at 15. This argument is unpersuasive because regardless of whether Derges believed the Gun Meme to be a credible threat, it could reasonably be perceived as an act of intimidation, bullying, or harassment, and Derges had a responsibility to investigate it as a violation of the school rules. When Derges searched J.S's cellphone, he had not yet uncovered the origins of the Gun Meme and Derges had information that J.S. often made memes that

9

featured W.J. As such, Derges had reasonable suspicion to search for evidence of the Gun Meme on J.S.'s cellphone. Additionally, Derges had reasonable suspicion to search for evidence of J.S. bullying W.J. or other students.

Plaintiff further argues Derges did not believe W.J. was being bullied because Derges did not adduce any information demonstrating changes in W.J.'s personality, health, grades, or any other information that could lead him to reasonably believe W.J. was aware of the other students making fun of him. D. 33, at 15-16. However, both the District and the High School have declared it is an important goal to prevent students from engaging in bullying and harassment. The Student Handbook, by which J.S. agreed to abide, defined bullying as including electronic communications directed toward a student "that has *or can be reasonably predicted*" to have a negative effect on the student. As such, Derges did not need to wait until W.J. exhibited the negative effects of bullying behavior to investigate and discipline students who engaged in the prohibited conduct. Derges had information that J.S. was known to bully W.J. and J.S. had a history of creating memes that made fun of specific people, including W.J. As such, Derges had reasonable suspicion to search J.S.'s cellphone for evidence of bullying behavior towards W.J. or any other student.

The Court now turns to whether the search of J.S.'s cellphone was reasonably related in scope to the circumstances which justified the search in the first place. A search is permissible in scope "when the measures adopted are reasonably related to the objective of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *T.L.O.*, 469 U.S. at 342.

Plaintiff characterizes the search of J.S.'s cellphone as a "digital strip search" and argues the only area which Derges could have reasonably expected to find edited or unedited pictures of

W.J. were within the Snapchat application. D. 33, at 19. Plaintiff contends that Derges exceeded the reasonable scope of the search by looking at the camera roll, which is the only area of the phone that Derges admitted to searching. *Id.*

Defendants argue Derges did not exceed the scope of the circumstances that justified the search in the first place because Derges believed he would uncover evidence of the Gun Meme or other memes directed at W.J on J.S.'s cellphone. D. 34, at 28. Defendants contend Derges reasonably suspected he would uncover evidence of a rule violation and the search was limited to areas where memes could be uncovered – i.e. the camera roll.

While Plaintiff likens the search of J.S.'s cellphone to a "digital strip search," it was not excessively intrusive for Derges to have viewed the camera roll of the phone. Derges may have been unfamiliar with Snapchat and he admitted he did not believe a Snapchat picture would save to the camera roll; however, it is reasonable to believe that evidence of the Gun Meme or other memes that targeted students would be found in the camera roll. As a matter of fact, Derges did find memes that targeted W.J. and others, which J.S. admitted to creating, within the camera roll. Plaintiff has not shown Derges looked at other applications which would push the search into the realm of excessively intrusive, such as J.S.'s emails, calls, messages, or web browser. Thus, the search of J.S.'s cellphone was reasonably related in scope to the circumstances of Derges' investigation. The undisputed evidence shows Derges reasonably suspected that a search of J.S.'s cellphone would uncover evidence J.S. had violated the school's conduct rules and the search was reasonable in its scope; therefore, Derges complied with constitutional standards and he is entitled to summary judgment on the matter.

*Whether Derges and Mouser are Entitled to Qualified Immunity*

Defendants argue an analysis of qualified immunity is unnecessary because Derges did no wrong and the evidence does not establish Mouser knew of an alleged custom of Derges conducting unlawful searches. D. 24, at 29, 35. Nevertheless, they contend Derges and Mouser are entitled to qualified immunity because Plaintiff has not shown that the law regarding cellphone searches by school officials was clearly established at the time Derges searched J.S.'s cellphone. *Id.* at 30. Defendants assert there is no authoritative case addressing the search of students' cellphones. *Id.* Since there was no constitutional violation and no clearly established right was violated, Defendants conclude they are entitled to summary judgment on the basis of qualified immunity. *Id.* at 32.

Plaintiff argues Derges cannot avoid liability under qualified immunity because he violated J.S.'s constitutional rights. D. 33, at 21-22. Plaintiff contends Derges had no good faith reason to justify the search because he did not believe there was an imminent threat to the safety of the school and because he had no information to suggest W.J. was in imminent harm. *Id.* at 21. Plaintiff also points to Derges' unfamiliarity with Snapchat and his admission that he did not believe a Snapchat picture would save to the camera roll, the area he admitted to searching. *Id.* Finally, Plaintiff argues Mouser is not entitled to qualified immunity because of "his indifference in tracking Derges's discipline and/or failure to discipline him for unconstitutional searches of other students[.]" *Id.* at 22.

Qualified immunity gives public officials "breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085, 179 L. Ed. 2d 1149 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct.

1092, 89 L. Ed. 2d 271 (1986)). The court applies a two-part inquiry to determine whether a defendant is entitled to qualified immunity. First, the court examines whether the plaintiff has presented evidence, taken in the light most favorable to the plaintiff, that would allow a reasonable fact finder to determine the plaintiff was deprived of a constitutional right. *Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007) (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), overruled in part by *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)). Second, the court examines whether the particular constitutional right was clearly established at the time of the alleged violation. *Id.*

      Here, Plaintiff has not presented sufficient evidence to show J.S. was deprived of a constitutional right when his cellphone was searched. Plaintiff's focus on whether there was a threat of imminent harm to the school or W.J. is misguided because there is no requirement that school officials must believe there is an imminent threat to justify a search, only that they have reasonable suspicion that the search will uncover evidence of a violation of law or school rules. Plaintiff relies on *G.C. v. Owensboro Pub. Sch.*, 711 F.3d 623 (6th Cir. 2013), in which the Sixth Circuit reversed the district court's grant of summary judgment. In *Owensboro*, a teacher caught the student sending text messages on his cellphone. 711 F.3d at 634. When the teacher confiscated the phone pursuant to school policy, the student became upset. *Id.* The Sixth Circuit found school officials did not have reasonable suspicion to justify the search because those facts did not indicate how a search of the student's cellphone would reveal evidence of criminal activity, impending contravention of additional school rules, or potential harm to anyone in the school. *Id.* Setting aside the fact that *Owensboro* is not authoritative, it can be distinguished from the instant case because Derges had information that he would uncover violations of the school's policy against bullying on J.S.'s cellphone.

Even if the Court were to find that Plaintiff had shown J.S.'s constitutional rights were violated by the search, Defendants would be entitled to qualified immunity because Plaintiff has not demonstrated that the constitutional right was clearly established at the time of the search. Plaintiff bears the burden of establishing that the constitutional right was clearly established at the time of the alleged violation. *Sallenger*, 473 F.3d at 739. The right must be clearly established "in a particularized sense, rather than in an abstract or general sense." *Abbott v. Sangamon Cty*, 705 F.3d 706, 731 (7th Cir. 2013). To defeat the defense of qualified immunity, Plaintiff must either identify a closely analogous case or persuade the Court that the conduct was so egregious that no reasonable school official would have thought he was acting lawfully. *Id.* at 723-24. Plaintiff has done neither.

The fact that Derges did not believe a Snapchat picture would save to the camera roll does not make the scope of his search so egregious that no reasonable school official would think he was acting lawfully. The fact that reasonable minds could differ as to whether it was lawful to search the camera roll under these circumstances leads to the conclusion that Defendants are shielded by qualified immunity.

*Defendant Mouser's Knowledge of Cellphone Searches*

The sole claim remaining against Mouser is premised on Derges' alleged ongoing custom of conducting unlawful searches of students' cellphones. D. 13; D. 18. Plaintiff is suing Mouser in his individual capacity. D. 18, at 3. To bring a § 1983 claim against Mouser for his role as the supervisor of Derges, Plaintiff must show Mouser knew about Derges' conduct, facilitated it, approved it, condoned it, or turned a blind eye toward it. *Jones v. City of Chicago*, 856 F. 2d 985, 992 (7th Cir. 1988). In other words, "[t]o be held liable for conduct of their subordinates, supervisors must have been personally involved in that conduct." *Id.*

14

The undisputed facts do not support Plaintiff's claims that Mouser knew of and condoned a custom of unlawfully searching student cellphones. In his deposition, Mouser said he understood that school administrators had authority to conduct a cellphone search only where the administrator had reasonable suspicion of a violation. D. 33-13, at 11:19-12:5. In his role as superintendent, Mouser had spoken with administrators about searching cellphones, specifically telling Derges and Athletic Director Roop to be sure they had reasonable suspicion before conducting any search. *Id.* at 46:6-16, 47:3-12, 48:9-15; D. 34-9, at 7 (19:10-16). Mouser stated he was not aware of Derges searching the cellphone of any other student before the incident with J.S. D. 33-13, at 54:3-17; 55:23-56:8. Mouser said he never received any complaints about Derges searching a student's cellphone. *Id.* at 55:15-22, 57:5-10, 145:4-9. Plaintiff admits this much, stating "Defendant Mouser has no knowledge of other cell phone searches conducted by Derges." D. 33, at 22.

Plaintiff described going to Mouser's office the day after the search of J.S.'s cellphone in her deposition. D. 33-5, at 67:6-78:9. At the time of their meeting, Mouser was not aware that Derges had searched J.S.'s cellphone the previous day. *Id.* at 73:12-16. Based on Plaintiff's representation of the search, Mouser condemned Derges' conduct and Mouser indicated "he would stop that from happening again." *Id.* at 73:21-74:14. Mouser also denied having any knowledge about the alleged searches of other students' cellphones. *Id.* at 77:3-24. In Plaintiff's Response, she claims Mouser "feigned a lack of knowledge" about Derges conducting searches of other students' cellphones during their meeting. D. 39, at 4-5. However, Plaintiff presents no evidence to contradict Mouser's avowed lack of knowledge, so there is no issue of material fact as to whether Mouser had knowledge of Derges' alleged custom of searching students' cellphones without reasonable suspicion. Given that Mouser had no knowledge of any alleged

15

custom of unlawful cellphone searches, Mouser could not possibly facilitate it, approve it, condone it, or turn a blind eye toward it. As such, Mouser is entitled to summary judgment.

## CONCLUSION

For the reasons set forth above, Plaintiff's Motion (D. 33) for Summary Judgment is DENIED and Defendants' Motion (D. 34) for Summary Judgment is GRANTED. The Clerk is directed to close the case.

Signed on this 6th day of July, 2020.

                                                 s/James E. Shadid\
                                                 James E. Shadid\
                                                 United States District Judge